457 A.2d 688 (1983)
E.E.C., Respondent Below, Appellant,
v.
E.J.C., Petitioner Below, Appellee.
Supreme Court of Delaware.
Submitted: May 14, 1982.
Decided: January 25, 1983.
Walter L. Pepperman, II (argued) and Francis J. Murphy of Morris, Nichols, Arsht & Tunnell, Wilmington, for respondent below, appellant.
Gerald Z. Berkowitz (argued), Wilmington, for petitioner below, appellee.
Before HERRMANN, C.J., QUILLEN and HORSEY, JJ.
*689 HORSEY, Justice:
This appeal of a domestic relations case is from an Order of Family Court granting a contested divorce to the petitioner-husband and disposing of the parties' cross motions for relief as to ancillary matters. Respondent-wife's appeal, confined to the ancillary rulings, raises multiple issues relating to the marital property division, wife's claims for support arrearages and alimony (temporary or permanent), and the Court's award to wife of attorney's fees and costs. We affirm in part, reverse in part and remand for modification of the judgment in the manner hereinafter indicated.

I
The parties were married in 1954, separated in 1963, and divorced in 1980. Two children were born of the marriage. At the time of the hearing in 1980, both children were of age, though the youngest, in college, *690 was then living at home with her mother.
Husband is a practicing lawyer and has been a member of the Bar of this State since 1960. Wife, after filling the dual role of a housewife and mother for some 9 years, resumed secretarial work and has been so employed full time for the past 14 years.
At the time of their marriage, wife, then 21, was already gainfully employed as a secretary. Husband, then 24, was a full-time college student. While husband remained in college and completed his undergraduate education, wife continued working to provide support. When husband went on to an out-of-state law school, wife secured employment to be with him. And she continued working until the birth of their first child in 1957.
In 1963, barely three years after husband's admission to the Bar, his opening of his law office and the birth of their second child, the parties separated. The separation was the result of a "steadily worsening" relationship between the parties that had become "intolerable", in the words of the Trial Court. With wife's full accord, husband left the marital home and never returned except to visit with their children. Thus began a separation that was to continue for the next 17 years until their divorce in 1980.
The following year, the parties became further estranged by husband's open involvement in an extra-marital affair. Nevertheless, husband proceeded with plans to sell their first home and relocate the family, at least wife and children, in a new and much larger second home.[1] But, by the time the "separation home" was completed, mid-1965, the parties had become still further estranged by events not necessary to detail. Hence, wife and children alone occupied the separation home  with husband's tacit, if not express, approval; and over the ensuing 14 years, wife had continuous and exclusive possession of the separation home.
In late 1966, husband traveled to Mexico and procured a Mexican divorce from wife without obtaining her appearance or consent. Thereafter, husband returned to Delaware and took up living with the third party. Later, husband presumably experienced misgivings over the effect of his foreign divorce on his Delaware marriage. For in 1969, husband again traveled to Mexico and secured a second divorce from wife. This time, husband relied upon a "waiver of appearance" signed by wife without the benefit of counsel. In reliance upon the validity of his second "Mexican divorce", husband remarried and again returned to Delaware to live with his second family.
The following year, 1970, the parties became embroiled in litigation in Delaware courts over various matters. Wife brought suit in the Court of Chancery for separate maintenance for herself and support for the children of the marriage. At issue in the separate maintenance claim was the validity of husband's 1969 Mexican divorce. (Husband apparently conceded his 1966 divorce to have been invalid.) In an unreported decision in 1971, this Court affirmed the Court of Chancery's ruling that husband's 1969 Mexican divorce was invalid because wife's appearance had been obtained under coercion and duress. HUSBAND, E.J.C. v. WIFE, E.E.C., ET AL., No. 61, 1971. The Court of Chancery then placed husband under an interim order for support of wife and the two children of the marriage of $600 per month, which was increased to $700 by final order entered in 1972. Prior thereto, husband had been making support payments to wife and children on a voluntary basis. Husband complied with the Court's support order until April, 1979.
*691 In the meantime, husband and his second wife in 1971 established their residence in another home (hereafter referred to as the "second family home") where husband has continuously resided to date with his second family.
The marital status of the parties to this action remained in that unsettled posture for another 8 years.
Finally, in late 1979, 16 years after the parties separated, husband filed for divorce in Family Court. His grounds were mutual and voluntary separation and incompatibility. Wife contested husband's petition; but after hearing, the Court found the parties to be mutually incompatible and granted husband's petition for divorce on July 3, 1980. The Court then disposed of the parties' cross motions for ancillary relief; and this appeal was then docketed by wife.

II
As stated, wife's appeal relates to three subjects: division of marital property; support and alimony; and attorney's fees and court costs. Within these three categories, wife raises seven questions on appeal.
A. Under 13 Del.C. § 1513, division of marital property: (1) whether the Court's failure to set a value on husband's law practice (conceded to be a marital asset) before assigning it to husband constitutes reversible error: (2) whether the Court's finding that husband had not dissipated his income was clearly erroneous; (3) whether the Court's disposition of the parties' separation home and of the liens against it was an abuse of discretion; (4) whether the Court's finding that the second family home was non-marital property was clearly erroneous.
B. Under the Court's alimony and support jurisdiction under 13 Del.C. § 507 and § 1512: (5) whether the Court's denial of wife's claim for support arrearages under a Court of Chancery separate maintenance order represented error of law or abuse of discretion; (6) whether the Court's refusal to award wife temporary or "permanent" alimony under 13 Del.C. § 1512 was an abuse of discretion or based on clearly erroneous findings; and
C. Under 13 Del.C. § 1515: (7) whether the amount of the Court's award to wife of attorney's fees and costs was an abuse of discretion.
Having raised these multiple grounds for reversal and grant of a new trial, appellant asks this Court to make its own findings of fact and to conclude this extended costly litigation unless remand for new trial or a limited rehearing is "absolutely necessary." Appellee expresses similar views while urging, of course, affirmance of the decision below on all issues.

A-1
As to the first issue, husband's law practice, the dispute is not over whether it was properly assignable to husband but its valuation. The trial transcript reflects the parties' sharp and protracted disagreement over how husband's law practice  a sole proprietorship  should be valued for purposes of a § 1513 property division.[2] The opinion of husband's certified public accountant (CPA) was that husband's law practice's value consisted of but two components: (1) the "actual" value of its "visible" (tangible) assets and (2) any work in process. Husband's CPA then determined the market value of husband's law practice to be $1,600, representing the difference between $7,781  the "actual value" of his office's tangible assets  and $6,152, its liabilities  to which he would have added the office's work in process, had there been any. In contrast, wife's CPA arrived at $158,000 *692 as husband's law practice's "fair" value (which he distinguished from fair market value)[3] as the sum of earnings capitalized and tangible assets. Taking $73,000 to be the average annualized net-after-taxes earnings for husband's practice, wife's CPA applied a factor of 2 to arrive at $146,000, to which was added $12,000 "for the practice as it's situated now."[4]
Each party attacked the other's expert both as to qualifications and valuation technique. Husband's CPA conceded he had no experience in valuing a law practice for purposes of purchase or sale; his experience was limited to valuing small businesses in general. However, he stated that he would apply the same approach to valuing a law practice as in valuing a small business operated as a sole proprietorship. With respect to wife's valuation approach, he stated he had never heard of a "fair value" approach. In his view, a capitalization of earnings approach was not appropriate because husband's earnings were not substantially greater than those of other attorneys of his age and experience. Further, husband's CPA contended that his client's 1977 earnings should be excluded in any averaging process because they included an extraordinary contingent fee not likely to reoccur. While wife's CPA professed to have had more experience in valuing interests in law practices, his experience was also limited and had not involved a sale of a sole proprietorship law practice. But wife contended that a law practice is "a business like anything else" for valuation purposes.
Rather than resolving this dispute over valuation,[5] the Trial Court disposed of the valuation issue by simply ruling that "each party shall retain the personal property now in his possession. This includes the $9,000 inherited by [wife] from her father as well as [husband's] law practice and the equipment and furnishings used in connection therewith." We cannot find within this statement any basis for concluding, as husband argues, that the Court's ruling is to be construed as necessarily implying acceptance of husband's $1,600 valuation and rejection of wife's $158,000 valuation of the marital assets.
In assigning a significant marital asset whose value is hotly contested without first making a finding as to its value, the Trial Court failed to comply with § 1513(a)(7) (see footnote 1 above). The Court has also disregarded the procedural guidelines for marital property division set out in Husband R.T.G. v. Wife G.K.G., Del.Supr., 410 A.2d 155 (1979) and in particular the following:
* * * (2) After the necessary factual record has been made, the Court shall make findings as to the value of all marital property, including the identity of each significant item of property, the value thereof and the nature of title thereto.
(3) The Court shall then determine which items of marital property, and value thereof, shall be assigned to each spouse .... 410 A.2d at 159.
*693 In failing to comply with § 1513(a)(7) and the guidelines of R.T.G., the Court has committed legal error. The Court has also impeded the review process. The Trial Court has made it impossible for the parties or the Court to determine what percentage of the parties' total marital assets were assigned to each and equally difficult for this Court to perform its review function as to the marital property division.
The parties' appellate briefing of the valuation question has not gone much beyond disparaging each other's expert's technique for valuing a law practice sole proprietorship. The only case (or other) authority cited by counsel in briefing is Stern v. Stern, N.J.Supr., 66 N.J. 340, 331 A.2d 257 (1975). Stern involved the valuation of a divorced spouse's interest in a law firm partnership for purposes of marital property division. The Court ruled that a lawyer's earning capacity was not to be deemed a separately identifiable item of property eligible for division or assignment as property acquired during the marriage. However, the Court ruled that the value of a lawyer's partnership interest (for marital property division purposes) should represent the sum of a lawyer-spouse's capital account and his proportionate interest in his firm's accounts receivable, work in progress, its goodwill, if any, and its tangible personal property (valued at any appreciation over book value or cost less his share of the firm's liabilities and accounts payable).[6]
If Stern does not preclude wife's capitalization of earnings technique for valuing husband's sole proprietorship practice, Stern certainly casts doubt upon any valuation technique primarily relying upon earning capacity as the basis for determining value of a marital property professional interest. Nor have we been referred to any authority that recognizes a capitalization of annualized earnings as a basis for valuing a professional sole proprietorship for § 1513 purposes.
As noted above in Stern, professional goodwill may constitute an element for valuation of a professional endeavor. But here the parties appear to concede that goodwill should be disregarded. Were goodwill a factor to be valued, one recognized, albeit criticized, accounting technique for determining value of goodwill does involve capitalization of earnings but only of excess earnings. See, Kennedy & Thomas, Putting a Value on Education and Professional Goodwill, 2 Family Advocate 3, at page 5 (Summer 1979). The article states:
The theory underlying the capitalization [of excess earnings] formula [for determining goodwill] is that a future flow of income has a present value and its value can be computed to an equivalent lump sum payment. An economist or an accountant, using the capitalization formula, can determine present value of the asset  goodwill  which produces the excess earnings.
However, the article criticizes even the capitalization of excess income as a method for determining goodwill on the ground that it improperly takes into consideration "income to be earned after the marriage is dissolved and ... [thus] represents, in effect, the division of postdivorce income ...." Kennedy & Thomas, Id. at page 5.
We see little substantive difference between the technique of discounting a future flow of income to determine present value and capitalizing an annualized average income. *694 Both valuation techniques seek to arrive at present value by reference to future income. We agree with Stern that earning capacity is irrelevant in determining the present value of marital assets for purpose of division of marital property under 13 Del.C. § 1513. It follows that wife's technique of valuing husband's sole proprietorship professional practice based on a capitalization of husband's earnings must be rejected. We conclude that husband's sole proprietorship practice should be valued for § 1513 purposes using the approach generally followed by husband's CPA.
In view of the desire of counsel to have this issue determined at this time and not through further proceedings on remand, we find husband's sole proprietorship to have, for § 1513 purposes, a present value of about $3,000. This figure represents the sum of the office's tangible assets, based on current market value, in excess of its liabilities, its accounts receivable and work in process. In this case, we understand the facts to be that husband's practice had no accounts receivable or work in process on the valuation date.
Given the nominal value of this marital asset assigned to husband and our later ruling on the disposition of the parties' separation home, we conclude that the Trial Court's failure to value husband's law practice was harmless error. Therefore, we reject wife's claim for an offset by reason of the Court's assignment to husband of his law practice, its equipment and furnishings.

A-2
Turning to wife's second claim of error in the Court's division of marital property, we conclude that the Court's finding that husband had not dissipated his income during the parties' marriage was clearly erroneous. The relevant facts pertinent to this issue are these:
At the time of the parties' separation in 1963, their assets were modest but so were their debts. They were limited to a mortgage on their first home, their major asset, and husband's outstanding educational loans. Husband's income as a sole practitioner was then modest but on a trend upward; and his practice showed promise.
In the 17 years of separation that followed, husband's law practice prospered, and particularly so over the final 10 years, 1970 to 1980. Over the latter period, husband's disposable income (i.e., income after federal and state income taxes and after all support payments to wife and children of the marriage) rose to an annualized average of nearly $34,000, or a 10 year aggregate of $340,000.[7]
But husband also failed to pay some $38,500 in federal and state income taxes owing and due for 1977; and over the ten year period husband also made further borrowings of about $50,000. Thus, over 1970-80, the funds at husband's disposal exceeded $400,000 ($340,000 + $38,000 + $50,000). And the aggregate funds available to husband over the 17 years of the parties' separation was somewhat in excess of $500,000.
However, by time of ancillary hearing in 1980, husband's net worth was close to nil. By husband's own admission, his debts then exceeded $100,000 and "far offset his minimal assets." Husband's only unliened asset was his law practice, previously determined to have a nominal value for § 1513 purposes; and husband's only significant marital property interest was his tenancy by entirety interest in the parties' separation home.[8]
On the issue of dissipation, the Court reasoned and ruled as follows:
Respondent [wife] alleged in her brief that from its inception the parties' marriage [in 1954] had in the main been one of self-sacrifice on her part and irresponsible *695 spending on the part of Petitioner, yet she characterized the family relationship as healthy and almost idyllic until 1963, the year of separation. In view of this characterization, it is hard to take seriously her allegations that Petitioner dissipated huge sums of money either before or after the separation. While Petitioner was undoubtedly less frugal than Respondent, his spending habits hardly rose to the level of dissipation. It seems more likely that his present financial difficulties are largely due to his determination to provide the best for both of his families.
* * * * * *
Legislative recognition of the relevance of dissipation of marital assets to a marital property division proceeding is embodied in 13 Del.C. § 1513(a)(6), which provides:
(a) In a proceeding for divorce or annulment, the Court shall, upon request of either party, equitably divide, distribute and assign the marital property between the parties without regard to marital misconduct, in such proportions as the Court deems just after considering all relevant factors including:
* * * * * *
(6) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker or husband....
Since the term dissipation is not defined by statute, reference must be made to its commonly accepted meaning, considering the context in which the word is used in our statute.

Dissipation n. 1.a. The act of scattering. b. The condition of being scattered; dispersion. 2. Wasteful consumption or expenditure. 3. Dissolute indulgence in pleasure; intemperance. 4. An amusement; a diversion.
The American Heritage Dictionary of the English Language.

Dissipate To destroy or waste, as to expend funds foolishly ... See also Drain. Black's Law Dictionary, 5th Ed.
In the context of subsection (6) of § 1513(a), "dissipation" is used as an antonym for the "contribution ... of each party in the acquisition, preservation ... of the marital property...." Clearly, then, evidence of a party's "dissipation" of marital income or other marital property is a statutory factor to be considered in arriving at an equitable division of marital property. In A.I.D. v. P.M.D., Del.Supr., 408 A.2d 940 (1979) this Court recognized § 1513(a)(6) as a "legislative mandate to consider dissipated property when an equitable division of property is to be made...." 408 A.2d at 943.
Viewing the Court's ruling in the context of § 1513(a)(6) and the facts of this case, we conclude that the Court committed error both on the facts and the law.
First, the Trial Judge's implicit finding of non-dissipation is not supported by the record and is not the product of an orderly and logical deductive process. Levitt v. Bouvier, Del.Supr., 287 A.2d 671 (1972). The facts are not contested as to husband's disposable income from his law practice or his tax deficiencies and borrowings over the parties' 17 year period of separation. During this period, husband's law practice, conceded to be a marital asset, produced disposable income of over $400,000 and yet at the time of ancillary hearing in 1980, husband had a negative net worth. These stark uncontroverted figures belie the Court's characterization of husband's spending habits over the period 1963-1980 as not rising "to the level of dissipation."
Second, the Court treats the matter of proof of husband's dissipation of marital property as if it were dependent on wife's credibility as a witness rather than as established by husband's own records. Finding wife's testimony to be wholly incredible as to the parties' pre-1963 compatibility, the Court cannot "take seriously" wife's testimony on husband's dissipation of assets either before or after their separation. The *696 reasoning does not follow; and its premise is faulty.
Third, the Trial Court's concept of "dissipation" differs from our construction of its meaning as found in § 1315(a)(6). As noted above, "dissipation" has various meanings and connotations depending upon the context in which it is used. Here, its meaning is to be gleaned from its use as a relevant statutory factor to be considered by the Court in arriving at an equitable division, distribution and assignment of marital property. But without explicit reference to its statutory meaning under § 1315(a)(6), the Court rejected wife's dissipation contention, stating:
... it is hard to take seriously [wife's] allegations that [husband] dissipated huge sums of money either before or after the separation. While [husband] was undoubtedly less frugal than [wife], his spending habits hardly rose to the level of dissipation. It seems more likely that his present financial difficulties are largely due to his determination to provide the best for both of his families.
The Court thereby accepted husband's essentially two-fold argument: (1) that none of husband's expenditures were "huge" when taken individually or on a yearly basis; and (2) considering that husband was supporting two families, his inability to contribute to the parties' marital property and the converse increase in his borrowings were not only understandable but excusable.
Thus, husband urges affirmance of this "factual" issue on the ground the Court's finding that husband had not engaged in dissipation in the sense of squandering or profligate living was supported by substantial evidence; and that his negative net worth, notwithstanding his prosperous law practice income, resulted simply from the fact that he "had to live beyond his income just to provide for the basic support of his present family." Husband also adds that the Trial Court properly ignored his expenditures of his disposable marital income, particularly that earned after 1970, for good reason: from any realistic point of view, the parties' marriage had ended seven years before, in 1963. We find none of these contentions tenable and must reverse as to this issue.
The question is not whether husband's expenditures of marital property for non-marital purposes were otherwise proper and, therefore, to be given no consideration in the division of the parties' marital property remaining at time of hearing in 1982. The question is whether husband's expenditures of acknowledged marital assets constituted a dissipation of marital property under § 1513(a)(6) so as to be a relevant factor to be considered in the ultimate division made by the Court.
Marital property is defined under § 1513(b) to include "all property acquired by either party subsequent to the marriage" (with three limited exceptions not here pertinent). Thus, we must find the Court to have committed legal error in disregarding husband's diversion of some $340,000[9] of income from marital property from the parties' marital assets otherwise available for division at time of ancillary hearing.
What follows from the Trial Court's erroneous disregard of the relevant factor of husband's dissipation of marital property is not easily converted to a dollar value. Within the single statutory factor of § 1513(a)(6) (referred to above), one party's "dissipation" must be weighed against the other party's "contribution", and then related to any other "depreciation or appreciation of the marital property" and to the allocation of such property between the parties. Further, § 1513(a)(6)'s express reference to the "contribution of a party as homemaker or husband" reflects an intended weighing of non-monetary values. Of *697 course, those factors must then be placed in their proper perspective with the other ten statutory factors enumerated in § 1513(a)(1) through (11).[10]
Since the Trial Court's omission of the "dissipation" factor is not in monetary terms an insignificant one, an appropriate adjustment in the marital property division award below would normally be determined on remand of the case to the Trial Court. But in this case, we think it appropriate for the adjustment to be made by this Court, not only for the reasons previously stated but because the Trial Judge has since retired.
The appropriate dollar adjustment to be made in the marital property division award below for husband's dissipation of the parties' marital property is not easily determined and obviously involves a fair degree of arbitrariness. We are mindful of the desire of the parties to have an end to this matter. We also recognize that there are only two pieces of property at hand and under the control of the parties as to which any adjustment may be made: the parties' separation home and husband's sole proprietorship law practice. As to the latter, we think it would be a mistake to disturb the status quo resulting from the Trial Court's assignment of the practice to husband, free and clear of any liens. This leaves us with any adjustment to be made in wife's favor from the Trial Court's disposition of the parties' separation home. We defer making the necessary adjustment for the Court's "dissipation" omission, pending our consideration of that issue.

A-3
We now take up wife's contention that Family Court abused its discretion in its distribution of the parties' separation home. We refer to the parties' second home into which husband voluntarily settled his wife and two young children in 1965, while husband became ever deeply committed in his extramarital affair. Over the next 14 years, wife and their two children made this property their home; and at time of hearing it remained their exclusive residence.
The decision to move the family into a substantially larger home had been husband's and had not been made until after the parties had been separated for some time. Husband's reason for doing so has been previously alluded to. (See footnote 1.) The new property, like the old, was titled in the parties' joint names and was then improved with funds borrowed by the parties in their joint names. These borrowings included a bank mortgage of $21,000 and a judgment loan of $10,000, co-signed by husband's parents.
From time of occupancy to date of hearing, wife assumed full responsibility for keeping the mortgage current as well as maintaining the property and paying all taxes, insurance and its carrying charges. *698 Wife's source of funds with which to maintain the property, including the mortgage, were husband's contributions to support and maintenance of wife and children and, from 1966 on, wife's earnings.[11]
By time of ancillary hearing, wife's periodic payments to amortize the mortgage on the separation home had reduced the first mortgage debt to about $3,500 but the balance due on the unamortized judgment rose to some $14,700.[12]
On essentially this evidence, Family Court reasoned as follows with respect to the appropriate disposition of the parties' separation home:
[Wife] has maintained the property single-handedly since 1965, albeit with the aid of liberal child support and alimony payments. On the other hand, she has had its exclusive use during all that time. If sold, the property, which is worth about $110,000, should, after payment of sales costs and outstanding liens incurred in its purchase and construction, produce a distributable net of about $80,000.
This property should be sold and the net proceeds divided 75% to [wife] and 25% to [husband]. In the alternative at [wife's] election, to be made within 10 days following notice of this decision, [wife] may purchase [husband's] interest for $20,000.
The Court further held each party responsible "for debts specifically incurred in the purchase, construction, or acquisition of any property awarded hereby to such party." The consequence of this was that wife was required to assume responsibility for repaying not only the $3,500 balance of the bank mortgage but also the $14,700 mortgage/judgment lien held by husband's father.

* * *
13 Del.C. § 1513(a) imposes on the Family Court the duty to "equitably divide" all marital property after considering "all relevant factors including" the eleven listed in § 1513(a). (See footnote 10 above.) The power thereby conferred on the Family Court to divide the marital property between the parties "in such proportions as the Court deems just" is "broad." J.D.P. v. F.J.H., Del.Supr., 399 A.2d 207 (1979). But notwithstanding the breadth of this power, it is not without limit; for the power to divide "equitably" confers only the power to divide "according to justice and fairness." Husband C. v. Wife C., Del.Supr., 391 A.2d 745 (1978).
Applying those general principles to the facts of this case, wife argues that the Trial Judge, by his disposition of the separation home, deprived wife of her "fair share" of the marital estate. She contends that the Trial Court failed to give proper consideration to the relevant statutory factors under § 1513(a) and thereby abused its discretion in its disposition of the separation home. Husband argues to the contrary, contending that the Court's 75-25 division of the property represents a fair weighing of the relevant statutory factors.
*699 We conclude that the Court's decision to award husband a partial interest in the marital asset referred to as the parties' separation home represents an inequitable division of the marital property made without due regard for all pertinent statutory factors set out in 13 Del.C. § 1513(a)(1) through (11). (See footnote 10 above.)
While the Court purported to relate the evidence to the pertinent statutory factors of § 1513(a), it did so in a manner we find lacking in objectivity. Thus, the Court, in considering the length of the marriage (statutory factor # 1), indicated, we think, an obvious bias against wife for not acquiescing in husband's first efforts to obtain a "Mexican" divorce. The Court stated:
While she has had and now has a legal right to defend against [husband's] efforts to get a divorce, the Court must consider to what extent her obstinate refusal to relinquish her hold on [husband] should be rewarded in arriving at a just property settlement.
In considering factor # 3 of § 1513(a), the Court recognized that husband's "amount and sources of income" far exceeded wife's on an order of 5 to 1 (a net after-tax differential of $50,000 to $10,000 in earning capacity); but the Court did nothing about it. The Court considered wife's claim of husband's dissipation of the marital property (statutory factor # 6) but concluded that husband's "spending habits hardly rose to the level of dissipation"  a determination which we have previously found to have been erroneous for its disregard of husband's diversion of some $340,000 of disposable law practice income. [See A-2 above.]
The Court's conclusion that husband's "liberal" child support and alimony payments require recognition (statutory factor # 7) is, we think, unfounded. Husband's after tax support of wife and children amounted to about $6,200 per year over the 16 years of separation. By husband's own calculations of the amount of his unallocated aggregate support properly attributable to child support, wife's so-called alimony receipts over the 16 year period totaled less than $15,000 in after-tax money. In contrast, wife, over the same period, paid some $47,000 towards the preservation of the separation home in reducing the mortgage and payment of taxes, insurance and maintenance of the property. Thus, wife deserves primary credit for the retention and appreciation of this item of marital property, which, for all intents and purposes, has been treated as wife's property almost from the time of its completion in 1965.
Equally important, the Court appears to have given no consideration to the fact that the parties' separation home was one of but two items of marital property of any significant value (other than gifts, bequests or inheritances) that the parties acquired and maintained over their marriage. The other property, of course, was husband's law practice, which the Court assigned without restriction to husband. While this latter asset has no significant market value, for reasons previously stated, the property was of incalculable value to husband in terms of providing him with a secure and substantial income in the future.
In view of the Court's outright and unfettered assignment of that significant marital property interest to husband, and husband's diversion, if not dissipation, of some $340,000 in marital property interests, the parties' separation home should, we conclude, have been awarded wholly to wife, subject to the remaining liens against the property being assumed by husband. We hereby do so.

A-4
We take up wife's final exception to the Court's marital property disposition under 13 Del.C. § 1513. We conclude that the Court's determination that husband's second family home was not marital property subject to division between the parties was supported by substantial evidence and, hence, not erroneous as a matter of law. That record evidence was: that the property was first rented by husband in 1971 for his second wife and family; the following *700 year the property was put on the market for sale and husband's father loaned husband and his wife the funds needed to purchase the property on condition that title be transferred to father's name; and sometime later, title was transferred from father's name to his son's second wife's sole name. Thereafter, husband used his law practice income to pay the mortgages on the property and for certain improvements to it. At time of hearing, the liens against the property (a first and second mortgage and husband's IRS indebtedness of $47,500) equalled, if not exceeded, its fair market value. On this evidence, the Court found that husband had no legal or equitable interest in the property notwithstanding husband's use of his disposable income to maintain the property; and, in any event, there was little, if any, equity in the property. We affirm under the substantial evidence rule. J.D.P. v. F.J.H., supra. To the extent that husband diverted marital assets (income from his law practice) to the maintenance and improvement of that property, we have taken that into consideration in our rulings under A-2 and A-3.

B-5

B-6

C-7
The remaining issues raised by wife concern: (5) the Court's failure to award wife the sum of $3,500 for husband's support arrearages under the Court of Chancery's 1972 order of separate maintenance for wife and children of $700 per month; (6) the Court's rejection of wife's request for temporary or "permanent" alimony under 13 Del.C. § 1512; and (7) the amount of the Court's award to wife of attorney's fees and costs under 13 Del.C. § 1515.
We affirm Family Court's rulings on each of these claims. The Court's express finding that wife was "not dependent upon [husband], does not lack sufficient property to provide for her needs, and is fully capable of supporting herself" was supported by substantial evidence, in particular her employment income as well as her retained and distributive share of the marital property. It is clear that the Family Court considered the relevant statutory factors for determining a claim for alimony under 13 Del.C. § 1512(b); and we find no abuse of discretion in the Court's exercise of its broad powers thereunder. R.E.T. v. A.L.T., Del.Supr., 410 A.2d 166 (1979).
We find no error of law or abuse of discretion in the Court's termination of husband's support and separate maintenance obligation to wife and children effective April, 1979, the date of husband's last payment. Husband's legal obligation to support his children had terminated well before that date upon the youngest reaching the age of majority; wife's lack of dependency had been established; and Family Court had succeeded to the Court of Chancery's jurisdiction over support and separate maintenance. 13 Del.C. § 507.
Finally, we find no abuse of discretion in the Trial Court's determination that $5,000 was the appropriate sum to be paid by husband to wife for attorney's fees and costs under 13 Del.C. § 1515. A.I.D. v. P.M.D., supra.

* * *
Affirmed in part and reversed in part; and remanded for modification of the judgment consistent herewith.[13]
NOTES
[1] The Trial Court attempted to rationalize husband's inconsistent course of conduct by concluding that husband's provision of a new home for wife and children represented "the last effort of a guilt ridden conscience to salvage a marriage ... [but] [t]he effort failed." Hereafter this property is referred to as the "separation home."
[2] 13 Del.C. § 1513(a) in pertinent part provides:

"In a proceeding for divorce or annulment, the Court shall, upon request of either party, equitably divide, distribute and assign the marital property between the parties without regard to marital misconduct, in such proportions as the Court deems just after considering all relevant factors including:
* * * * * *
(7) The value of the property set apart to each party; * * *"
However, § 1513 is silent as to the definition of "value" or how value is to be determined.
[3] Wife's CPA conceded that ethical constraints rendered a professional practice, in this case a sole proprietorship, unsaleable and, hence, could not be said to have any market value. Husband took the position that his law practice had no market value because he had "nothing to sell"; hence, his practice as such had no fair market value.
[4] Husband's net-after-tax earnings for the six most recent years were (in rounded figures) as follows: 1974, $37,400; 1975, $47,500; 1976, $52,600; 1977, $75,900; 1978, $38,800; 1979, $37,800. As will be seen, averaging those earnings over five or six years produces a figure ranging from $48,333 to $42,820, depending upon whether 1977 earnings are included or excluded, for reasons hereafter stated.
[5] The Trial Court had earlier found husband to have "a reasonably good law practice, and, absent a substantial business decline, ought to net after taxes at least $50,000 a year for as long as he chooses to practice his profession." In the context of the statement, it is clear the Court was then considering the relevant statutory factors of 13 Del.C. § 1513(a)(3),

"(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties...."
[See footnote 1 above for preceding language of subparagraph (a) of § 1513].
[6] The Court also found a probable correlation between the above figure and the aggregate sum payable under a partnership agreement upon the partner's death funded in part by life insurance presumably owned by the firm on the partner's life. Thus, the Court would have included any firm goodwill in its valuation of the firm assets, but then added:

The good will of a law firm, for ethical reasons, may not be sold or transferred for a valuable consideration. N.J. Advisory Committee on Professional Ethics, Opinion 48, 87 N.J.L.J. 460 (1965). It may, however, in a given case, be possible to prove that it does exist and is a real element of economic worth. Concededly, determining its present value presents difficulties. Rev.Rul. 609, 1968-2 Cum.Bull. 327.
331 A.2d 257 at 261, n. 5.
[7] Over the period 1964-1969, husband's disposable income averaged about $13,000.
[8] The second family home, titled in husband's second wife's name, was found by the Trial Court not to be marital property, and, in any event, the mortgages and other liens against it exceeded its equity.
[9] We expressly exclude from this amount husband's income tax non-payments and his post-separation borrowings. These sums are either clearly inappropriate for inclusion in marital property otherwise subject to appreciation or not clearly established to qualify as marital property under § 1513(b).
[10] 13 Del.C. § 1513(a)(1) through (11) provides:

(a) In a proceeding for divorce or annulment, the Court shall, upon request of either party, equitably divide, distribute and assign the marital property between the parties without regard to marital misconduct, in such proportions as the Court deems just after considering all relevant factors including:
(1) The length of the marriage;
(2) Any prior marriage of the party;
(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties;
(4) Whether the property award is in lieu of or in addition to alimony;
(5) The opportunity of each for future acquisitions of capital assets and income;
(6) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker or husband;
(7) The value of the property set apart to each party;
(8) The economic circumstances of each party at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the party with whom any children of the marriage will live;
(9) Whether the property was acquired by gift, bequest, devise or descent;
(10) The debts of the parties; and
(11) Tax consequences.
[11] From 1964 through 1969, husband paid wife $6,000 per year for support of wife and their two children. Thereafter, husband's support of wife and children was increased by court order to $600 per month in 1970 and in 1973 to $700, or $8,400 per year, taxable to wife. Wife's taxes, state and federal, on this gross sum averaged about $3,300 per year between 1974 and 1979. Hence, husband's net after tax support of wife and children amounted to about $5,100 per year over the last 6 years of their marriage. Over the latter six year period, wife's annual net earnings after taxes rose from $6,000 to slightly under $10,000. Over the period 1970-1980, wife's disposable income (net earnings plus net support after taxes) averaged $13,300. In contrast, husband's disposable income over the same 10 year period (earnings after taxes and less support paid through April 1979) averaged $34,000 per year.
[12] In 1973, the bank's judgment note had been marked to husband's father's use after he had been required to pay it off. Later, husband's father took a second mortgage against the property as further security for repayment of the debt which then amounted to about $13,000. As still further security, husband's father took a second mortgage on his son's second family home after transferring title to that property from his father's name to the name of his son's second wife.
[13] Since the appeal has been taken from an order of Family Court granting a divorce to petitioner-husband as well as ancillary relief, on remand a final decree of divorce should be issued forthwith.